THE PLANTERS' RICE-MILL COMPANY *vs.* THE MERCHANTS' NATIONAL BANK OF SAVANNAH; and the same *vs.* THE SOUTHERN BANK OF THE STATE OF GEORGIA.

1. Warehouse receipts, pure and simple, with only the incidents annexed to them by law, and none superadded by special contract, conduct or representation, are no more obligatory in the hands of *bona fide* holders for value than in the hands of the original bailor of the property stored.

2. But if warehouse receipts of a special form and character be adopted and issued in due course of business for the express purpose of being pledged as security to obtain money, and if, as a part of the regular system of using them, the warehouseman acknowledges in writing on each receipt notice of assignment by the pledgor to the pledgee before the latter advances his money thereon, the pledgee, after advancing his money in good faith, is entitled to stand on the terms of the pledged receipt as importing a genuine business transaction of the nature described in the instrument. Thus, though in fact no goods had been received for storage, the recital in the special receipt being utterly false, nevertheless the recital will have the same effect in protecting such *bona fide* pledgee as if the goods had been received and stored.

3. He who creates a symbol and leaves it a symbol, is bound by it only in its symbolic character; but he who creates a symbol and aids in raising it to a security, is bound by it both as a symbol and a security.

4. An agent to tell the truth may bind his principal by telling a lie. A wrongful exercise of delegated authority is not the assumption of authority, but the abuse of it. Thus, an agent empowered to issue and acknowledge receipts of a given kind, based on real transactions, does not, by wrongfully issuing and acknowledging receipts of a like kind, based on fictitious or simulated transactions, pass beyond the scope of his authority, but acts fraudulently within it.

5. A pledgee, holding the legal title and damaged to the full extent of the debt secured by the pledge, including attorneys' fees promised him in the contract creating the debt, may recover from a defaulting bailee of the property pledged, the whole debt, including such attorney's fees, provided the recovery do not exceed the value of the property.

March 25, 1887.

Contracts. Receipts. Written Instruments. Principal and Agent. Fraud. Pledges. Bailments. Before Judge HARDEN. City Court of Savannah. November Term, 1886.

The facts in these two cases were similar, and they were argued and determined together; and a statement of one will suffice to show the controlling points made in both.

The Merchants' National Bank brought suit against the Planters' Rice-Mill Co. The declaration contained two counts. The first was a count in trover in the statutory form; the second was a count for damages, alleging the giving of the receipts stated below. On the trial, the evidence showed, in brief, the following facts: George Schley applied to the Merchants' National Bank of Savannah for the loan of $2,100, offering as security 2,963¾ bushels of rough rice. The rice was represented by a receipt of the Planters' Rice-Mill Company, which set forth that the company had received on storage in its mill from Geo. Schley 2,963¾ bushels of rough rice, which were in bins 162 and 164; that the rice was deliverable to him " or his order," upon surrender of the receipt, properly endorsed; and that the mill would make no claim against said rough rice except for such charges and storage as might accrue thereafter. This receipt is signed " W. T. Owen, Sup't." On

this receipt the following was endorsed: "Notice acknowledged this 27th day of February, 1886, that the Merchants' National Bank holds this receipt. W. T. Owen, Supt." George Schley's name was written across the back of the receipt, and with it George Schley offered what he represented were samples of the rice. The bank agreed to make the loan, and on March 1, 1886, Schley made, executed and delivered to it his note, whereby he promised to pay said bank on demand twenty-one hundred dollars with interest at the rate of seven per cent. per annum. Then appears in the note the following:

"To secure the prompt payment of this note, or any general balance due or to become due the Merchants' National Bank, I hereby pledge the following collaterals now in possession of said corporation: Special receipt Planters' Rice-Mill, No. 283, for 2,963¾ bu. rough rice stored in Planters' Rice-Mill, $1.01 invoice value."

The note concludes as follows:

"In case of default, I hereby agree to pay any attorneys' fees and costs of court that may be incurred in securing the rights of said corporation and collecting any amount or balance which may remain unpaid under this instrument."

With this note Schley delivered to the bank the receipt, endorsed as aforesaid.

On April 13, 1886, Schley applied to the bank for another loan of $1,500, offering as security a receipt of the Planters' Rice-Mill Company for 2,367¼ bushels of rough rice, identical in form with the receipt on which the former loan had been obtained and bearing endorsements in the same form. He presented what he represented were samples of these 2,367¼ bushels of rice. The bank agreeing to make the loan, Schley made, executed and delivered to it his note for $1,500, due on demand and bearing interest from date and until paid at the rate of seven per cent. per annum. This second note contains provisions and stipulations in the same form as those quoted above from the first note. With this note he delivered the receipt for the 2,367¼ bushels of rice. The bank placed to Schley's credit the respective amounts of the notes on the date

when the same were given, and these amounts subsequently were drawn out on his checks.  After the second note was given, there was a decline in the price of rice, and the bank, to make sure of the value of the rice pledged by Schley, sent to W. T. Owen, the superintendent of the rice-mill company, for samples; the superintendent brought them to the bank, stating that, as he was coming up town, he brought them himself.  These samples were submitted by the bank to a rice broker, who reported that one lot was worth $1.15 per bushel and the other $1.12. Interest was paid on both loans up to June 1st.  Early in July, W. T. Owen, the superintendent, absconded.  The vice-president of the bank made demand on the president of the rice-mill company, July 12, for the rice represented by the receipts, and was informed that the rice was not in the mill, and never had been there, and for that reason the demand was refused.

The defendant introduced evidence to show that the rice had never been in the mill.  Owen had been superintendent of the mill for years, and was paid a salary of $2,500 a year.  He attended to and superintended the storage and milling of rice at the defendant's mill; he looked after all the ordinary business of the mill and, as Taylor, the president of the mill company, testified, he (Owen) was the man to go to for the transaction of the usual business affairs of the company.  The president stated also that Owen was authorized to issue receipts for rice actually in the mill, but not for rice which was not there, and that he attended to matters of business outside of the scope of the superintendent's duties.  The rice-mill company had an up-town office where its monetary affairs were attended to by its treasurer.  There were no books kept at this up-town office which showed the owners of the rice at the mill.  Owen kept the rough rice ledger down at the mill. When rice came into the mill, the owner was credited on this ledger therefor; if he wished to borrow money on his rice, a receipt in the form of the two receipts held by the

v 78-37

bank was issued to him, and an entry was made on his account in the ledger, showing when and for how many bushels of rice the special receipt was issued, and also who was the holder of it. This form of receipt was only used to enable the patrons of the mill to borrow money; it had been prepared by Owen by instructions of the directors of the mill company and was approved by them. The banks were accustomed to lend money on this form of receipt, signed by Owen as superintendent, and no question was made of his authority to issue them to patrons of the company when the rice called for by the receipt was in the mill. Schley's name does not appear on the rough rice ledger. It was not known to the bank that Owen had anything to do with the loans made to Schley or had any personal interest in the transactions; he was only known to the bank in these matters as the superintendent of the rice-mill. But as a matter of fact, Schley was, without the bank's knowledge, acting for Owen in procuring these loans; receiving from him the receipts and the samples of rice and paying to him the proceeds of the loans which were drawn out on Schley's checks, but not being payable to Owen or his order. Schley testified that he acted innocently in the matter, believing that Owen had the rice called for by the receipts.

The defendant showed that the receipts had upon them certain numbers which referred to what was termed "the turn" of rice deposited in the mill; that books were kept at the mill which showed what became of rice according to the "turns"; that these books were open to the inspection of parties interested in the rice, but not to people in general; that from the ledger kept by Owen, it appeared that no such rice had ever been deposited in the mill as that for which the receipts in controversy were issued; that one of the receipts stated that the rice referred to by it was deposited in bins numbers 162 and 164, though, in fact, there were no such bins; and that the bank did not send to the mill to make investigation as to the

rice being there or as to the books. The charter and by-laws of the defendant were introduced in evidence. From the former it appeared that the company was incorporated to carry on the business of milling rice, with power to purchase and hold buildings, machinery, etc. convenient therefor; to receive, mill and prepare rice for market on toll; to receive and keep rice on storage; and to do all other things necessary or convenient to the business, except purchasing rice for the purpose of traffic. The amount of attorneys' fees for collection of notes was shown to be ten per cent.

The jury found for the plaintiffs $3,600, with interest and ten per cent. attorney's fees. The defendant moved for a new trial on the following among other grounds:

(1) Because the verdict was contrary to law and evidence.

(2) Because the court refused to charge as follows: "The agency of a person employed by a warehouseman to receive goods does not commence until after the reception of the goods by him; and any act or representation of such agent with regard to goods never received is beyond the scope of his agency and is void as against his principal."

(3) Because the court refused to charge as follows: "Except in the case of bills of exchange, notes and negotiable paper strictly so-called, the person to be charged is never estopped to show any equities existing between the first taker and himself; therefore if it should appear from the evidence that Schley could not recover from the defendant upon the receipt issued by W. T. Owen to him, then plaintiff, his assignee, cannot recover."

(4) Because the court refused to charge as follows: "A corporation chartered for the purpose of receiving and pounding rice on toll, and which has employed an agent to receive rice which has been offered for pounding at its mill and superintending the operation of the mill, has no authority to issue a receipt for rice which has

never been received at the mill and has never been in the possession or custody of the defendant; and this will operate with greater force when such unauthorized receipt is delivered by such agent to the party holding the same at the office of the latter."

(5) Because the court refused to charge as follows: "The only holder of collateral security in Georgia who stands on the same footing as a *bona fide* purchaser for value, is the holder of negotiable paper strictly so called." .

(6) Because the court refused to charge as follows : "If the evidence disclosed any fact or circumstance which, in contemplation of law, should have tended to put the bank, at the time it loaned the money to Schley, on inquiry, and the bank failed to make the investigation which, if made, would have developed the fraud, the bank in such case is to be treated as if it had actual knowledge of the facts."

(7) Because the court, after charging as follows: "The storing of rice with the defendant is mere contract of bailment, and the receipt is the mere evidence thereof; and no custom of the defendant to treat its receipts as negotiable and as entitling the holder to demand and receive the rice, could change the legal character of the bailment," added the following explanation: "But it might change the way in which the receipt should be regarded, while it would not change the legal character of the bailment and the effect which the receipt should have with reference to the standing of the parties among themselves."

(8) Because the court, after charging as follows: "Parol evidence is admissible to explain a warehouse receipt; and the warehouseman is not estopped to show that the goods were never received by him," added the following explanation: "I will add this, that it depends on the position of the original parties to the receipt. He can show, or he cannot show, as circumstances are in this case ; if he can show that the goods were not received, and the party who says they are knew they were not there, or ought to have known they were not there, he cannot recover.

Therefore in some cases he is estopped, and in others he is not."

(9) Because the finding for the plaintiff of ten per cent. attorneys' fees was illegal.

The motion was overruled, and the defendant excepted.

CHARLTON & MACKALL, for plaintiff in error.

CHISHOLM & ERWIN; GEO. A. MERCER, for defendants.

BLECKLEY, Chief Justice.

These two banks brought severally their actions against the Planters' Rice-Mill Company in the city court of Savannah, and recovered. The company moved for a new trial in one of the cases on nineteen grounds, in the other on twenty-one grounds. The motions were overruled.

The actions were complaint, both substantially alike, the declaration in each having a count in trover and a special count on the facts. The cause of action was the failure of the rice-mill company to deliver rice in pursuance of certain receipts which it had issued, acknowledging the rice to be in its possession in store. The company is a corporation with chartered power to receive, crush and store rice. It had issued through its superintendent certain receipts in a special form, acknowledging that an individual by the name of Schley had in the mill a certain quantity of rice stored. Each one of these receipts had a printed entry on the margin, filled out in writing with the name of the bank which held it; and this entry was signed, as was the receipt itself, by the superintendent of the mill. The entry imported an acknowledgment of notice by the company that the bank was the holder of that receipt. [The defence to the actions was based upon the fact that the receipts were fraudulent, and that there was no rice behind them.] The rice-mill company sought to avoid the receipts, upon proof that the receipts acknowledged rice which never came to hand. The

receipts by their recitals imported that Schley had a certain quantity of rice in the mill. Schley had no such rice, nor any rice. He used these receipts as pledges upon which to obtain money, and he did obtain money, to a large amount from each of these banks, on the faith of the receipts. At the trial, this defence was gone into very fully, and all the circumstances under which the receipts were issued and pledged were presented to the jury. It was alleged that the banks ought to have known that the receipts were fictitious, that there were certain circumstances to put them on inquiry, and that had they made inquiry, they would have discovered the fraud. But the banks replied by evidence which tended to show that they used all diligence with which they were chargeable; and the jury so found, under a very fair and full charge by the court.

1. There can be little doubt that a warehouse receipt is a mere symbol of property. It is the shadow of an absent substance; and when it has passed from one hand to another, it is only symbolic of the property it represents; and if it represents no property, its holder has nothing but a mere piece of paper. That is the general character and effect of a warehouse receipt, just as of a bill of lading. Warehouse receipts, pure and simple, with only the incidents annexed to them by law, and none superadded by special contract, conduct or representation, are no more obligatory in the hands of *bona fide* holders for value than in the hands of the original bailor of the property stored.

2. This principle, however, does not rule these cases. These documents are not ordinary warehouse receipts, and they were not left to the mere incidents annexed to them by law; but contract, conduct, representation on the part of the rice-mill company intervened, both in the issuing of these receipts and in their transfer, which clothed them with other and larger incidents than the general law would have annexed to them if they had been mere warehouse receipts in ordinary form. If warehouse receipts of a spe-

cial form and character be adopted and issued in due course of business, for the express purpose of being pledged as security to obtain money, and if, as a part of the regular system of using them, the warehouseman acknowledge in writing on each receipt notice of assignment by the pledgor to the pledgee before the latter advances his money thereon, the pledgee, after advancing his money in good faith, is entitled to stand on the terms of the pledged receipt as importing a genuine business transaction of the nature described in the instrument. Thus, though in fact no goods had been received for storage, the recital in the special receipt being utterly false, nevertheless the recital will have the same effect in protecting such *bona fide* pledgee as if the goods had been received and stored.

It is in evidence in one of the cases we are dealing with directly, and in the other inferentially, that these special receipts were adopted and always issued for the express purpose of enabling the bailor, or the person acknowledged as the bailor, to pledge them as security for money. When such a purpose was not in contemplation, another and different form of receipt was used, one that did not purport on its face to be special, and one that did not have annexed to it this form of acknowledging notice of the assignment. The mill corporation adopted and authorized the use of these special receipts for the very purpose of enabling its customers to obtain loans upon them, and in this instance they were so used, under circumstances that justified the banks in not making inquiry beyond the inquiry which they did make; and the jury were justified in reaching the conclusion that they fully discharged themselves of all diligence that was incumbent upon them.

3. He who creates a symbol and leaves it a symbol, is bound by it only in its symbolic character; but he who creates a symbol and aids in raising it to a security, is bound by it both as a symbol and a security. Why not? As a mere symbol, each of these receipts is but colorable evidence of bailment which never took place. It repre-

sents property which never existed, and is therefore worthless; but the corporation raised it from its rank as a mere symbol to its rank as a security for money. It would be a mere emblem if they had not made it more; but having made it more, there is something of the nature of a real presence in it; a real presence of the thing it purports to represent.

4. Thus far the cases have been considered as if there were no element of agency in them. If this corporation could have acted without an agent, and had so acted by issuing these receipts and acknowledging the transfer of them, what has been said would be conclusive; but it acted through an agent, and the real defence is, that the agent did not have authority to bind the corporation, his principal, where no rice was in fact stored, and where the transactions on which the receipts purported to be based were wholly fictitious. The evidence leaves no question that the agent was authorized to issue receipts of this character. The receipts belonged to a class which the agent had power to issue, and not only to issue, but to acknowledge; and every act of acknowledgment was a recognition of the rightfulness of the receipt. That was part of the purpose, doubtless, of having the acknowledgment; it was to have the receipt recognized as an obligatory instrument upon the rice-mill company, and this agent was the right agent, under the evidence, both to issue the receipt and to enter this acknowledgment of notice upon it. So that the paper, as a class, was paper he had power to issue and deal with just as he did in these instances.

An agent to tell the truth may bind his principal by telling a lie. A wrongful exercise of delegated authority is not the assumption of authority, but the abuse of it. Thus, an agent empowered to issue and acknowledge receipts of a given kind, based on real transactions, does not, by wrongfully issuing and acknowledging receipts of a like kind, based on fictitious or simulated transactions,

pass beyond the scope of his authority, but acts fraudulently within it. To hold otherwise would be to rule that an agent cannot commit a fraud and affect his principal by it. Here he had a rightful authority to do a certain class of acts. He did a number of those acts by the wrongful exercise of that authority. His principal must be responsible both for the authority conferred and for its faithful exercise, in so far as there is a right to rely upon the fidelity of its exercise. In many cases, the law will authorize strangers to rely upon the acts of an agent, and in many cases it will not.

It authorized these banks to trust to the exercise of the authority, just as fully as they could trust to the existence of the authority; and the mill company is as much bound by the abuse as by the use of the authority which it conferred, the banks being entirely ignorant of such abuse until long after they parted with their money.

5. A question was made as to the right of the banks to recover counsel fees as a part of their damage. Schley, their debtor, stipulated in his contracts to pay counsel fees in case any were incurred by the bank in collecting. These counsel fees were added by the jury, in arriving at their verdict, to the principal and interest of Schley's debt due to the banks, we think correctly; because the value of the property covered by the receipts, had it been property at all, would have been in excess of the whole recovery; and we think the cost of counsel fees, where collection had to be enforced by law, was as much a part of the loss of the banks as the principal and interest. So we rule this: A pledgee holding the legal title and damaged to the full extent of the debt secured by the pledge, including attorneys' fees promised him in the contract creating the debt, may recover from a defaulting bailee of the property pledged, the whole debt, including such attorneys' fees, provided the recovery do not exceed the value of the property.

We have not been able to assure ourselves that there

was absolutely no error in any of the grounds of the motions for new trial, but only that there was none which influenced the result.   The verdict was indubitably right in each case, and the refusal of a new trial was correct.

Judgment affirmed.