53 F.2d 374 (1931)
THE CARSO.
MOLINELLI, GIANNUSA & RAO, Inc., et al.
v.
NAVIGAZIONE LIBERA TRIESTINA et al., and four other cases.
No. 407.
Circuit Court of Appeals, Second Circuit.
August 4, 1931.
*375 Loomis & Ruebush, of New York City (Homer L. Loomis and Philip A. Donahue, both of New York City, of counsel), for appellant.
Single & Single and Harry D. Thirkield, all of New York City (Gregory S. Rivkins of New York City, of counsel), for appellees.
Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.
AUGUSTUS N. HAND, Circuit Judge.
These appeals are from interlocutory decrees holding the steamship Carso liable in five different libels filed for cargo damage to shipments of cheese. Each libel alleged the delivery of cheese at Naples destined for New York, that bills of lading were issued by the vessel acknowledging that the merchandise was placed on board the steamship "in apparent good order and condition" and arrived damaged by reason of being covered with "skippers" or maggots and having lost practically all of the butter fat. The answers admitted the receipt of the merchandise by the vessel subject to the terms and provisions of the bills of lading issued therefor, *376 and, with the exception of the answer to the libel of Western Sausage & Provision Company, admitted that the merchandise was delivered in the same order and condition in which it was received for shipment. The answers also set forth clauses in the bills of lading to the effect that the carrier was not to be responsible for damage arising from "vermin * * * leakage, wastage * * * decay, heating, sweating," and that notice of claims for damage arising under bills of lading "must be given in writing by the Consignees to the Agents of the Ship at the Port of Destination within 48 hours after the landing of or failure of the Carriers to deliver * * * goods."
The merchandise was sold f. o. b. Naples, and the payment was to be by sixty-day drafts upon the purchasers. The proof showed that prior to the time of shipment the cheese became infested with maggots. When the consignees accepted the drafts, accompanied in every instance by clean bills of lading, they did not know that the merchandise was damaged, but supposed it to be in "apparent good order and condition" as represented in the documents. Some of the cases of cheese at the time of shipment had stains indicating damaged contents, and other cases showed breakage. The District Court allowed recovery on the ground that a prima facie case was made out by the clean bills of lading and that by the recitals therein the carrier was estopped to deny that the cheese was received in good order and condition.
There are 1,050 cases of damaged cheese in question. They are divisible into three groups:
The first group consisted of 162 cases which, like the rest, contained cheese that was damaged when shipped. There is no proof that the bad condition was known to the steamship or that the cases were not in "apparent good order" when they were taken on board.
The second group was of 420 cases. The mate's receipts given for these cases by the vessel contained the notation, "broken  not answerable for contents." The contents were damaged at that time, but there is nothing to indicate that the breakage contributed to the damage or that the carrier was aware that the cheese in these 420 cases was not "in good order." The damage was due to the vermin that infested the cheese and not to any breakage of the containers.
The third group was of 468 cases. The mate's receipts covering these shipments contained the notations, "cases stained by the contents," or "all the cases show stains originating from the contents." The cheese in this group was also damaged by vermin before shipment. Bills of lading for 365 out of the 468 cases were issued by the carrier only after securing agreements of indemnity from the shippers.
The District Judge did not appear to distinguish the three groups of claims which we have alluded to from one another, but treated all alike, and allowed each libelant an interlocutory decree whether or not there was any proof that the carrier had means of knowing that the cheese was damaged prior to receipt on board.
In respect to the first group of 162 cases, nothing indicates that any of them appeared to be in other than good order when shipped, nor is there evidence that the carrier was aware that any of the cases of this group was damaged when taken on board. The stains appearing upon the 468 cases of the third group, even if indicating damaged contents cannot be taken as showing that cheese shipped in the 162 cases which bore no stains was in the same condition as that in the 468 cases. The recital in the bills of lading was only that the shipments were received in "apparent good order and condition." So far as the record shows, this recital was true of the 162 cases. Therefore, libelants' proof failed as to them, and the claims of Molinelli, Giannusa & Rao, Inc., for 15 cases under bill of lading No. 174, and of Bortola Bendin for 66 cases under bill of lading No. 169 (both libelants in libel 1) and of Italian Importing Company (libelant in libel 3) for 81 cases under bill of lading No. 167, must be dismissed.
In the second group of 420 cases, clean bills of lading were issued, and the mate's notations showed that the cases were in defective condition, but there is no proof that the cheese was known to be damaged at the time of shipment, or that its damaged condition was due to breakage of the containers. On the other hand, it appears to have been due to other causes. Upon whatever theory damages might be awarded, it may be contended that they cannot be allowed upon a mere theory of estoppel as to the 420 cases because the representation in the bills of lading, though false, was unconnected with the condition of the cheese. The carrier would be estopped to show that these cases were not broken, but not to show that the damage was caused by skippers which had attacked *377 the cheese before shipment. This the evidence in respect to the 420 cases indicates. Accordingly libelants' proof as to these 420 cases fails, and the claims of R. Gerber & Co. for 50 cases under bill of lading No. 157, J. S. Hoffman & Co. for 100 cases under bill of lading No. 164, Antonio Morici & Co. for 50 cases under bill of lading No. 162, Rocco Perretta & Co. for 25 cases under bill of lading No. 155 (all libelants in libel 2), and Italian Importing Company (libelant in libel 3) for 30 cases under bill of lading No. 165, for 50 cases under bill of lading No. 156, and for 45 cases under bill of lading No. 161, and of Western Sausage & Provision Company (libelant in libel 4) for 70 cases under bill of lading No. 163, must be dismissed.
But the 468 cases stand in a different category. The mate's notations say either that these cases were "stained by the contents" or "show stains originating from the contents." Dr. Redfield, a consulting food bacteriologist from the Department of Agriculture, said that the words "stained by the contents" indicated "that the butter fat had exuded from the cheese, out on to the cases." The cheese was in fact infested with "skippers," and the tests made by claimant's expert Pozen upon exudations of similar cheese showed proportions of 60 per cent. butter fat from the cheese and 40 per cent. olive oil from the film with which the cheese was coated. The testimony shows that the skippers probably infested the cheese through careless screening at the time of manufacture, or, if not, when it was upon the lighters and prior to the issue of the bills of lading. Whenever they attacked it, they bored into the surface so that the oil film acted as a solvent and caused the leakage. Heat would promote this disintegration, but with a sound unbroken cheese the effect of solution exerted by the olive oil film would be negligible. The proof indicates (1) that the skippers were present when the cheese was placed on board; (2) that this was the only reasonable explanation of the breaking of the surface of the cheese necessary to make the olive oil act as a solvent; (3) that the exudation of the contents of the cases brought about the stains and was known to the carrier when it issued the bill of lading.
The cheese was packed in boxes about 30× 20×12 inches in size, made of unplaned wood and three-fourths of an inch thick with interstices between the joints of from one-thirty-second to three-sixteenths of an inch and bound with iron hoops. It seems reasonable to say that the cheese must have exuded through these small crevices to a marked extent in order to cause the ship's officers to make such notations as "stained by the contents" and to require agreements of indemnity for 385 out of the 468 cases.
The facts somewhat resemble a case of a shipment of cheese in a glass container where the carrier could see that the interior of the cheese was exuding through the rind, and yet issued clean bills of lading reciting that it was in "apparent good order and condition." In such a situation the carrier would be estopped to show that it was not in actual good order and condition.
It appears from the testimony that "skippers" are the insects that commonly infest cheese. They operate by boring holes and breaking down the surface, and the results follow that occasioned the damage in this case. Exudations sufficient to justify the mate's notations and to explain the agreements of indemnity indicated to the carrier that the cheese was infested with this vermin and was in process of decay.
The consignees have proved their case by showing that the cheese arrived in a damaged condition and started in a good condition, and this in spite of the fact that the admissions in the bills of lading were only of receipt in "apparent good order and condition." This is so because the particular defect which the consignees complain of was apparent to the ship by reason of the exudations at the time the clean bills of lading were issued. This decay was progressive, and the damage discovered when the cheese was unloaded was due to it. As soon as the consignee proved that the decay from which the damage ultimately resulted was apparent, he made out his case, for the ship had recited in the bill of lading that it was not apparent and the consignee had a right to rely on this statement as conclusive proof that there was no apparent defect. The consignee could further prove as a fact that there was no decay of which there were not apparent signs. These two elements of proof can be taken together to show that the cheese started out in good condition. The consignee has by the recital in the bill of lading proved that the cheese was in good order and condition though strangely enough he has had to do this by first showing that the ship knew it was not so in fact and notwithstanding issued a clean bill of lading.
It may be argued that estoppel is only a rule of evidence and has no bearing in a *378 situation where the libelants have themselves shown that the goods were damaged before shipment. But such a doctrine would ordinarily deprive a consignee who had advanced money on a clean bill of lading of a right of action on the document. In cases where he learned only after he had advanced his money that the goods were shipped in bad order he could never make even a prima facie case without proving the true facts and thus showing that the recitals in the bill of lading were false. An estoppel is not a mere rule of evidence, but is in effect a rule of law whereby facts in favor of one party which the other party is estopped to deny are absolutely established. As Professor Williston says in his book on Contracts, § 1508:
"An estoppel like a conclusive presumption, is a rule of substantive law masquerading as a rule of evidence. To speak of conclusive evidence of something admittedly false may be a useful formula, but it disguises the truth. An estoppel is in effect a conclusive admission of a non-existent fact. This supposed fact may be essential either for a cause of action, for a defense, or for a replication. As the fact is non-existent it is obvious that the admission and nothing else supplies the requirement which would otherwise be lacking. If the admitted non-existent fact alone creates a cause of action, defense, or replication, the admission or estoppel is the sole foundation, if other facts are needed a partial foundation, of the cause of action, defense or replication.
"An estoppel then may be, and frequently is, either the sole or the main foundation of a cause of action. When a warehouseman states to an intending purchaser in answer to an inquiry that the seller has a certain quantity of goods stored in the warehouse, and, relying on that statement, the purchaser completes the bargain, the warehouseman is estopped to deny the truth of his statement. The only essential facts of the purchaser's case when he sues the warehouseman are the misrepresentation, his own reliance upon it, and perhaps a demand and refusal. * *"
In Olivier Straw Goods Corporation v. Osaka Shosen Kaisha (C. C. A.) 27 F.(2d) 129, the District Judge, who had dismissed the libel, was reversed and we allowed the libelant to recover under a "shipped on board" bill of lading for goods which had never been shipped but were destroyed in the Japanese earthquake. The bill of lading recited "apparent good order and condition," and the libelant put in evidence (Exhibit 5 in that suit) a letter from the agents of the carrier stating in substance that libelant's cargo was never put aboard. To the same effect are Armour v. Mich. Central Ry. Co., 65 N. Y. 111, 22 Am. Rep. 603; Bank of Batavia v. New York, L. E. & W. R. Co., 106 N. Y. 195, 12 N. E. 433, 60 Am. Rep. 440; Coventry v. Great Eastern Ry. Co., 11 Q. B. D. 776; Planters' Rice-Mill Co. v. Merchants' Nat. Bank, 78 Ga. 574, 3 S. E. 327.
Where the Harter Act (section 4, 46 US CA § 193) requires that bills of lading shall state the "apparent order and condition" of merchandise and safe reliance upon the truth of representations in bills of lading is so necessary for business dealings, the carrier should be held bound to the statement he makes wherever it has been acted upon in good faith and the person acting upon it is injured because of the misrepresentation.
But it may be said that cheese might be infested with "skippers" and not exude so as to stain the cases at the time of shipment and that other cheese involved in these libels turned out to be of this very sort. It may be reasoned from this that the carrier is only estopped to show that the cheese which it received had so far deteriorated that it had begun to exude when shipped and may still prove either that cheese infested with skippers which had not begun to leak would certainly become worthless, or, in any event, would reach a further degree of deterioration; that in answer to this defense the consignee may show that cheese which had not begun to leak would not become as much damaged as cheese which had, and that the difference in value of these two kinds of cheese at the port of destination represents the only recoverable damages. But such a theoretical limitation of damages where the carrier knows that the apparent internal condition of the cheese is bad is not reasonable. His representation that it is in apparent good order and condition is a representation that it is in good order, for its actual condition in such a case is its apparent condition to him.
Moreover, while admiralty has not jurisdiction over torts committed on land, the courts have granted similar remedies to consignees against carriers who issue false bills of lading whether they have proceeded in suits upon the bills of lading or in actions at law for deceit. The only difference has been that in the latter form of action recovery has been limited to the amount of the purchase money. It can hardly be supposed that, if the carriers in Higgins v. Anglo-Algerian S. S. Co. (C. C. A.) 248 F. 386; Martineau's, *379 Ltd., v. Royal Mail Steam Packet Co., Ltd., 17 Com. Cas. 176; Compania Naviera Vasconzada v. Churchill & Sim, [1906] 1 K. B. 237; or Brandt v. Liverpool, Brazil & River Plate S. N. Co., [1924] 1 K. B. 575, had proved that other goods might have been affected by wetting which had caused damage, but damage that might so far have disappeared as to leave no external sign, the difference between the value of such goods and those actually loaded would be the limit of recovery. Nor can it be thought that, if a carrier recited that it had received silk in good order and condition, when the silk was known to be rotten, the damages in a suit upon the bill of lading would be limited to the difference in value of the particular silk and rotten silk the damage of which was not apparent. Yet, if such a rule were applied to the present case, the damages would be limited to the difference in value between decayed goods which started stained, and decayed goods which started unstained.
The difficulty of applying estoppel with strict logic is apparent in numerous situations, but the disregard in the decisions of the difficulties involved in the estoppel theory may be taken to indicate that, when a bill of lading has been issued stating that goods known by the carrier to be damaged are in apparent good order and condition, the recital is one that their condition is in fact good in the respects that were apparent.
While any treatment of a case of this kind upon the basis of estoppel involves inconsistencies, the above conclusion seems justified by the trend of the authorities and the necessities of the case.
The same results might be reached under the theory of a warranty which we invoked in a different situation in Olivier Straw Goods Corporation v. Osaka Shosen Kaisha (C. C. A.) 47 F.(2d) 878. While a recovery might be had upon this theory for the 468 cases of cheese, such a remedy would afford no relief as to the 420 cases where only the boxes showed damage. Damage to the containers was no proof that the cheese itself was not sound.
When a carrier has made a false representation about a condition of merchandise taken on board which is likely to involve progressive decay, it should be compelled to abide by the consequences and should not be allowed to invoke the exceptions in the bills of lading relieving it from damage arising from "vermin * * * leakage, wastage, * * * decay," for these things were all promoted by the condition of the cheese which it has said did not exist. The exception covering "heating" should, for the same reason, be unavailable.
If it is suggested that the consideration paid by the consignees in reliance upon the false representation made in the bills of lading is recoverable, the answer is that damages based upon the amount of the consideration paid are not the proper measure of damages in an action for breach of warranty, and can ordinarily only be recovered in an action for deceit. Such an action is open to the consignees of the 420 cases if they can establish the necessary facts.
If the foregoing reasoning be sound, nothing stands in the way of recovery except the notice clause. But the provision for giving notice to the carrier "within 48 hours after the landing" of the goods of any claim arising under the bill of lading ought not to be held effective in circumstances like the present. Where a carrier has issued false bills of lading reciting that merchandise is in "apparent good order and condition" though it is not, it has done affirmative acts calculated to mislead the consignees as to the existence of the very claims they are here asserting. They had no reason to believe that the cheese was damaged when shipped, and might well have supposed that the exceptions in the bills of lading completely protected the carrier from claims based upon the deterioration of a commodity like cheese and that no valid claims against the steamship existed. At any rate, the knowledge of the true facts was wholly in the possession of the carrier and could not speedily be obtained. The carrier, by issuing false bills of lading, has concealed the true facts from the consignees and impeded their presentation of proper claims. Under such circumstances, the notice clause was rightly held unenforceable, as was similarly done in Higgins v. Anglo-Algerian S. S. Co., Ltd., (C. C. A.) 248 F. 386. See, also, Olivier Straw Goods Corporation v. Osaka Shosen Kaisha, supra.
The decree is affirmed in so far as it relates to the 468 cases. It is reversed in so far as it relates to the 162 and the 420 cases, with directions to dismiss the libels to the extent that they involve claims outside of the 468 cases.
L. HAND, Circuit Judge (dissenting in part).
I agree with the disposition of these appeals, so far as it concerns the two parcels of 162 unbroken and unstained cases, and of 420 broken, but unstained cases. I do not *380 agree as to the third parcel of 468 unbroken, but stained cases. The case as to these depends upon the effect of the statement in the bills of lading that the cases were "in apparent good order and condition." Were these suits between the shipper and the ship upon the contract of carriage, the shipper would make out a case by showing the condition of the goods on delivery, and that they had been damaged at the outturn. The ship must excuse this by some exception. A "clean" bill of lading would make out a prima facie case, so far as the outward appearance of the cases, bales, wrappings, casks, or the like, told of the condition of the contents. I can see no reason why it should go further, either in principle or justice, though some decisions have intimated the contrary. The ship can tell nothing of the contents except as the outside betrays it. If it does not, I cannot agree that the shipper would prove his case. He would prove only that kind of contents which necessarily follows from fair cases or bales. That might or might not be enough, depending on what was the damage at issue.
When the libellant in such a suit is not the shipper, but a consignee who is a bona fide holder of the bill of lading, the situation is precisely the same with one exception; the ship is estopped to deny the truth of the statement that the cases or bales were in apparently good condition. So much the decisions cited in the main opinion settle, and The Isla De Panay, 267 U. S. 260, 45 S. Ct. 269, 69 L. Ed. 603, seems to confirm. I agree that this is more than a mere rule of procedure whose office ends when proof goes in as to the condition of the goods in fact. That is exactly the difference between it and the same declaration in the same bill of lading before it has reached the hands of a bona fide holder. The declaration is incontrovertible between the parties, both in itself, and as a step in any chain of reasoning in which it is relevant.
In a suit upon the contract of carriage it can have no other function. True, it may be the basis for the recovery of the purchase price in an action of deceit, but that is another matter. I can see no reason why it should toll the ship's exceptions in general. Certainly no such point was decided in Brandt v. Liverpool, etc., Co., [1924] 1 K. B. 575, or Olivier Straw Goods Corp. v. Osaka Shosen Kaisha (C. C. A. 2) 47 F.(2d) 878, in each of which there was a deviation. So far as there is language looking in that direction in Higgins v. Anglo-Algerian S. S. Co. (C. C. A. 2) 248 F. 386, I would overrule it. It seems to me contrary to any principle to strip a ship of part of her contract, when the consignee invokes that very contract as the basis of his cause of suit, as he does by relying upon the estoppel. Deviations do indeed so strip the ship; she has not performed the contract at all, and the court decides the case just as though none had been made.
The suits at bar are, therefore, to be decided like any other except that it must be taken as an incontestible fact that the contents of the 468 cases were not leaking. So far as this proved the condition of the cheese, the libellants have succeeded, but no further. However, unstained cases may contain infected cheese, and cheese which has begun to rot. The whole shipment was infected and presumably more or less decayed. It makes not the least difference what the ship actually knew about the 468 cases, or with notice of what she was charged. That would be relevant enough, if her owners were being sued in deceit, but the whole doctrine is thrown into confusion, if we confound the declaration with its truth in fact. The estoppel is to avoid going into the facts at all; for the purposes of the suit the facts are to be disregarded. They make no difference, nor does the ship's knowledge of them.
The libellants, having proved only that they had delivered cheese which had not leaked, are confined to the value of such cheese as the first term in their equation of loss; the other being the value at outturn, which is conceded. They may prima facie recover, therefore, for that amount, but they must be content to accept the value of cheese which was infected or incipiently rotten, so long as the rot did not show on the outside. The ship must bring the damage so estimated within an exception. She has no difficulty in so doing, provided that it happened on board. In many cases this is just where she will fail. For example, if the damage be due to leakage from broken cases, and she has given a "clean" bill of lading, she must concede that the cases were whole on delivery, and she cannot in fact prove that they were broken during the voyage. Thus she cannot use her exceptions, because whole cases do not leak. Again, if the damage be from wetting, and she cannot prove that in fact the bales were wetted on board, she loses, because dry bales do not go bad unless wet from the outside. However, in the case at bar the ship may be able to prove that infected, or partially rotted cheese, though its *381 cases showed no leak, would completely spoil on board. Many of those which we know to have shown no leaks, did in fact spoil, though possibly not as much as the 468 cases. So far as she can prove this, she will excuse the loss under the exception. It seems very unlikely that the final recovery will be appreciable.
The ship would further have a complete defense even as to this in the notice clause, of which prima facie she ought not to be deprived any more than of her exception. However, the distinction taken in the main opinion seems to me reasonable; notice clauses are not in any event popular with courts. Moreover, this was the ruling, as distinct from the opinion, in Higgins v. Anglo-Algerian S. S. Co. At the risk of possible inconsistency, I agree as to the disposition of this point.
Therefore, I would allow the libellants to prove damages calculated in the way I have suggested. If they fail, or will not try, I would dismiss the libels in toto.