## THE SOPHOCLES.

District Court, S. D. New York.
Aug. 2, 1943.

Maclay, Lyeth & Williams, of New York City (J. M. Richardson Lyeth and Robert L. Fay, both of New York City, of counsel), for libellants.

Haight, Griffin, Deming & Gardner, of New York City (John W. Griffin, Wharton Poor, and John C. Moore, all of New York City, of counsel), for the Sophocles.

Bigham, Englar, Jones & Houston, of New York City (Andrew J. McElhinney, of New York City, of counsel), for John N. Matthews.

Carpenter & Stevenson, of New York City (J. Roland Stevenson, of New York City, of counsel), for Pioneer Terminal Corporation.

COXE, District Judge.

This is an action for alleged damage to a shipment of 34,290 bags of crude talc powder shipped on the M/V "Sophocles" at Bombay, India, in June, 1941, to be delivered in New York. The vessel arrived at New York in August, 1941, and it was found on discharge that the talc in 17,410 of the bags was damaged due to the presence of excessive moisture and the rotting of the bags.

The libelants are the holders in due course for value of the bill of lading covering the shipment, and it has been stipulated that they are entitled to bring the action. This bill of lading, dated June 16, 1941, was signed by the master, and acknowledged receipt of the talc in apparent good order and condition. The only notation appearing on the document was "several bags torn, slack and resewn. A.A.".

The claimant of the vessel is the Director of Shipping and Curator of the Royal Norwegian Government, who conducts business under the name of The Norwegian Shipping and Trade Mission.

The libel alleges that the talc was shipped in good order and condition; that a bill of lading was duly issued therefor acknowledging receipt in apparent good order and condition; and that on discharge at New York the talc was in damaged condition due to "contact with fresh water and/or sea water or other substances * * *". The answer of the claimant is in substance a denial of fault on the part of the vessel.

During the course of the proceedings two stevedoring concerns having to do with the unloading of the vessel at New York were impleaded as respondents, namely, Pioneer Terminal Corporation and John N. Matthews, doing business as Universal Terminal Stevedoring Company. It has, however, been stipulated that neither of these concerns was responsible for the damage, and that the impleading petitions might be dismissed with prejudice but without costs.

The libelants base their claim entirely on estoppel. They admit that the vessel was not at fault for anything connected with the carriage, but they say that the talc was not received in apparent good order and condition as represented by the bill of lading. They say, further, that they relied on

the representation, and are, therefore, entitled to damages on the authority of Higgins v. Anglo-Algerian S.S. Co. 2 Cir., 248 F. 386, and The Carso, 2 Cir., 53 F.2d 374. It is conceded by the claimant that from 200 to 400 of the bags were not in apparent good order and condition when received, and liability is admitted to that extent. The case presents a single fact question, namely, whether the bags, other than the 200 to 400, were received by the vessel in apparent good order and condition.

The libelant offered no evidence regarding the history of the talc or the condition of the bags prior to or at the time of shipment, but rested entirely on statements from three witnesses in Bombay obtained by the claimant, together with the testimony of the four officers of the vessel, taken either by deposition or orally at the trial. The Bombay witnesses were Portlock, agent of the vessel at Bombay, Amberkar, chargeman of tally clerks during the loading, and Mody, stevedore foreman in charge of the loading. It was stipulated that the statements of these witnesses might be received as their respective testimony. The four officers who testified were Amundsen, the master, Samuelsen, the chief officer, Norum, the second officer, and Raugstad, the third officer.

The talc originated at the shippers' mines in Central India, and was packed in heavy burlap bags with inner cotton cloth linings, each bag containing 98 lbs. net of crude talc powder. From the mines the talc moved to Bombay by rail. What transpired during this long rail journey has not been disclosed. The bags reached Bombay at different dates between April 16 and May 21, 1941, and on the last mentioned date 34,290 bags were there waiting shipment.

Of this total of 34,290 bags which arrived at Bombay during the period to May 21, 1941, 20,642 bags were unloaded from the cars at some time prior to the arrival of the vessel, and placed in a pile outside of sheds Nos. 7 and 8 Victoria Dock, where they remained until the loading of the vessel commenced, and were then removed to shed No. 2 Victoria Dock by the shippers. The other 13,648 bags were unloaded directly from the cars at shed No. 2 Victoria Dock, where the vessel was berthed.

The "Sophocles" arrived at Bombay in ballast on June 12, 1941, and tied up at the pier upon which shed No. 2 Victoria Dock was located. The vessel had previously taken a cargo from United States ports to Alexandria, and had been held up at Port Said for twenty or twenty-one days. The loading of the talc commenced on June 13, 1941, and was finished on June 17, 1941. The bags were taken indiscriminately from those brought from the pile outside of sheds Nos. 7 and 8 and from those in shed No. 2; they were loaded on the vessel in No. 1 and No. 5 lower holds and in the deep tanks of No. 3.

The main controversy centers around the bags from the pile outside of sheds Nos. 7 and 8, for it is to those bags that the libelants point as the possible seat of the damage to the cargo. The official Bombay weather reports show that there was a rainfall in Bombay on June 6, 1941 of 1.1 inches, and on June 7, 1941 of 4.14 inches. It is argued from this that with such a heavy rainfall on two consecutive days the bags may well have become thoroughly wetted only a short time before the loading of the vessel commenced. The difficulty with the argument is that the evidence does not show when the bags were placed outside of sheds Nos. 7 and 8, nor how they were protected prior to the arrival of the vessel.

The evidence relating to the bags outside of sheds Nos. 7 and 8 covers only the period after the arrival of the vessel on June 12th. Amberkar and Mody, two of the Bombay witnesses, testified that when they came to the dock to load the vessel on June 13th they saw the pile. Amberkar said that the talc "was stacked on wooden ceilings and covered with tarpaulins"; that it was "dry and that there was a lot of dust on it"; and that the bags were "stacked about 20 bags high". Mody said that the talc was "in a dump in the open near 7/8 shed", and that it was "stacked on wooden boards and covered by tarpaulins". Captain Amundsen testified that while the vessel was loading he went ashore each day, and in doing so had to pass the pile of bags both going from and coming to the vessel. The bags were on wooden planks and covered with heavy tarred tarpaulins. On one occasion before the loading commenced, he was on his way to the vessel with Portlock, the agent for the vessel, and they stopped and inspected the bags. Amundsen removed the tarpaulins, felt some of the bags and found "powder on the bags, in good condition outside". He saw no wet bags. Amundsen also said that on the following day he again had occasion to inspect the

pile while the men were taking the bags away, and that the "dust was just lying around".

All seven of the witnesses for the claimant testified that the bags, with the exception of 200 to 400 which were discolored, were externally dry and covered with white dust when loaded on the vessel. Samuelsen, the chief officer, said that during the loading white dust was "all over the ship"; that the bags were "dusty from this white dust"; and that, with the exception of about 200 discolored bags, the bags appeared in good condition. He also said that in the afternoon of June 15 he first noticed two discolored bags coming on board, and that these two bags, with other discolored bags, were later loaded at the top of No. 5 hold.

Norum, the second officer, and Raugstad, the third officer, gave similar testimony to that of Samuelsen with respect to the condition of the bags during the loading. These two officers divided watches in supervising the loading. Norum said that he first saw some discolored bags in the evening of June 16th, and that they were segregated and, with the other discolored bags, were loaded last at the top of No. 5 hold. He estimated that there were from 200 to 400 of these discolored bags. Raugstad said that the cargo was dusty with white dust on the outside of the bags; that the bags "seemed to be all right" except for about 200 discolored bags placed at the top of No. 5 hold; that he first saw the discolored bags on June 17, after they had been loaded in No. 5 hold, and they were sticky and "the powder on the outside wasn't dry". Captain Amundsen said that he saw about two-thirds of the cargo as it came on board, and that he did not see any wet or discolored bags, "just dust". Portlock, Amberkar and Mody were equally positive that the bags they saw were in apparent good order and condition.

The "Sophocles" loaded other cargo at Bombay besides the talc, consisting mainly of wool, skins, and bags of seed. The vessel left Bombay on June 19, 1941, and proceeded to Karachi, where additional cargo of cotton and wool was taken on board. On the way to Karachi the master had occasion to look into the holds, and Samuelsen pointed out the dirty bags at the top of No. 5 hold. The master testified that this was the first knowledge he had that any stained or damaged bags had been loaded at Bombay.

The vessel arrived at Boston on August 16, 1941, where part of the cargo was discharged in good condition. From Boston the vessel proceeded to New York, arriving there on August 25, 1941, and tying up at Pier 8, Brooklyn. The unloading of the talc commenced soon afterwards and continued at Piers 8 and 9, Brooklyn, until August 30, 1941, when the unloading was completed.

There is little dispute regarding the condition of the talc on arrival at New York; many of the bags were discolored, and had rotted so that they fell apart during the unloading; much of the talc was lumpy and caked, and some was "pasty and really wet". The sound and unsound bags were intermingled throughout all three holds where the talc was stowed. The discolored bags were found at the top of No. 5 hold, and appeared "badly discolored, black, and you could see that they had been wet". There were between 300 and 400 of these discolored bags. In the final tally there were 17,410 bags which out-turned damaged, and the remaining 16,680 bags were accepted by the consignees as sound. The sound bags looked white on the outside due to the siftings, and all of the bags were covered with talc dust.

Professor Turner, testifying as an expert for the claimant, said that he examined what remained of the cargo at Piers 8 and 9, Brooklyn, on September 10, 1941, and subsequently. He found piles of talc in various states of destruction, and sound sacks; there were "sound sacks with apparently dry talc in them, and some sacks apparently sound too with wet talc in them". He also said that he found sacks where the moisture content was not as high on the outside as on the inside. He took samples from the middle of some typical sacks, and then later determined by analysis that "the moisture content on the inside of sacks that appeared to be the wettest ran about 25 per cent, or around 25 per cent". He also conducted an experiment with a bag of talc having a moisture content of 25 per cent, and found that after hanging the bag in the sun for "a matter of a few hours" the moisture content on the outside had fallen to about 12 per cent. Professor Turner's general conclusion was that the damage was caused by fungus or bacterial rotting resulting from the moist condition of the bags; that the bags could have been wet at an earlier time, and still have appeared dry on the outside, if exposed to the sun; and

that, after such bags which appeared dry on the outside had been stowed in a confined space for a sufficient period of time, the moisture would diffuse uniformly throughout the bag, and possibly extend to the adjoining bags.

The libelants say that the testimony of the claimant's witnesses with respect to the condition of the bags at the time of loading is at variance with other evidence in the case, and should, therefore, be rejected. They refer particularly to the evidence relating (1) to the pencil notations on the mate's receipts, and (2) to oral statements said to have been made by Samuelsen, the chief officer, during the unloading of the vessel at New York.

The record contains carbon copies of two mates' receipts, the originals of which were signed by Samuelsen, the chief officer, namely, (1) Receipt No. 401, dated June 13, 1941, for 7,507 bags, and (2) Receipt No. 470, dated June 16, 1941, for 26,-783 bags. Samuelsen testified that he could not recall the date when he signed the first receipt, but that it was signed "prior to the last day", and that he gave instructions for writing out the receipt "S.N.R. for contents", meaning "ship not responsible for contents." The copy of the receipt in evidence contains a pencil notation reading "several bags torn and resewn. S.N.R. for contents". The second receipt has the same pencil notation as the first receipt. Samuelsen said that the representative of the shippers protested to him against the use of these notations on both receipts, and that he later rubbed out the phrase "S.N.R. for contents". The libelants argue from this that the phrase "S.N.R. for contents" on the first receipt must have had reference to other bags than the 200 to 400 discolored bags which were loaded in the evening of June 16. The first receipt was not signed, however, on the day of its date; all that Samuelsen said was that it was signed before the last day of the loading. In the meantime, Samuelsen noticed two discolored bags coming on board in the afternoon of June 15, and these were put aside for later loading with other similar bags. I think it is reasonably clear from this testimony that the pencil notation on the receipt was for protection against the discolored bags and did not have reference to the other bags.

■ The libelants introduced evidence of conversations with Samuelsen, the chief officer, on three separate occasions while the talc was being unloaded at New York. The first of these conversations was with Bedell and Lynner; the second and third were with stevedores engaged in unloading the vessel. Proper foundation was laid for the first conversation but not for the other two. The evidence relating to the first conversation will, therefore, alone be considered, and the others disregarded. See Chicago, M. & St. P. R. v. Artery, 137 U.S. 507, 519, 11 S.Ct. 129, 34 L.Ed. 747.

■ Bedell, a cargo surveyor employed by the Insurance Company which insured the shipment, testified that on August 16, 1941, he had a conversation on board the vessel with Samuelson, the chief officer, at which Lynner, a cargo surveyor representing the claimant, was present. Bedell said that he asked Samuelsen if he could account for the damage. The substance of Samuelsen's response was that he could, that the talc had been stored on an open pier at Bombay and had been covered with tarpaulins, that he knew that many of the bags were stained and damaged, that he did not want them to come on board, and that he made vigorous protest to the captain and the people on shore, but was overruled. Samuelsen, when he was examined by deposition at New York on September 17, 1941, readily admitted the conversation with Bedell, but said that he was at the time "pointing in No. 5 hatch" and merely referring to the 200 to 400 discolored bags. Lynner's version of the conversation was that Samuelsen was complaining only about the trouble he had had with the discolored bags during the loading at Bombay. The testimony regarding the conversation is not entirely satisfactory, but taking it together I think it supports the position of the claimant that Samuelsen was referring only to the 200 to 400 discolored bags. Even if I am wrong in this opinion, I do not believe the result would be changed, for it is well settled that proof of inconsistent statements of a witness can be considered only for the purpose of impeachment and not as substantive evidence of the truth of the matter stated. Southern R. Co. v. Gray, 241 U.S. 333, 337, 36 S.Ct. 558, 60 L.Ed. 1030; Southern Pac. Co. v. Kauffman, 9 Cir., 50 F.2d 159, 161; 70 Corpus Juris, p. 1153, § 1339-b.

■■ On all the evidence, I am satisfied that the libelants have not shown that the representation of the bill of lading was

false except as to the 200 to 400 discolored bags. They clearly had the burden of making this proof, and failed to do so. See The Carso, 2 Cir., 53 F.2d 374, 376. I think, also, that the testimony of the claimant's witnesses is credible. Even if it be assumed that the talc became wet in the rains of June 6th and 7th, it is not at all improbable that the bags would have dried externally in the fierce heat which obtained in Bombay during the subsequent period to the loading of the vessel. That was the opinion of Professor Turner, and I think it is borne out by the evidence.

There may be a decree for the libelants only for the damage to the 200 to 400 bags loaded at the top of No. 5 hold, and dismissing the libel as to the balance of the shipment, but without costs to any of the parties.