**THOMAS ROBERTS & CO. v. CALMAR S. S. CORPORATION et al.**

**No. 45 of 1942.**

District Court, E. D. Pennsylvania.

Feb. 22, 1945.

Shields, Clark, Brown & McCown, of Philadelphia, Pa., for libellant.

Krusen, Evans & Shaw, of Philadelphia, Pa., for respondent Calmar Steamship Corporation.

Rawle & Henderson, of Philadelphia, Pa., for respondent St. Paul Fire & Marine Ins. Co.

KALODNER, District Judge.

This is a libel for cargo damage against the Calmar Steamship Corporation wherein the libellant cargo owner, Thomas Roberts & Company, has joined the St. Paul Fire & Marine Insurance Company as a respondent.

The legal status of the libellant, its ownership of the goods, the fact of the shipment and issuance to libellant of the bill of lading and certificates of insurance, the fact of damages and the amount of libellant's net expense in reconditioning the goods are admitted by respondents by stipulation. Although there are collateral issues, there are two broad questions for determination: Whether the Calmar Steamship Corporation is °answerable for the damage, and whether the damage comes within the risks insured against by the St. Paul Fire & Marine Insurance Company.

On the basis of the pleadings and the testimony, I make the following

### Findings of Fact

1. At all times involved in this case, the libellant was and now is a partnership consisting of W. W. Thrasher, L. A. Thrasher, W. J. Rothrock, and J. H. Rothrock, general partners, and Wainright Churchill, special partner, trading as Thomas Roberts & Company, with a place of business at No. 135 South Second Street, Philadelphia, Pa.

2. Respondent, Calmar Steamship Corporation, at all times involved in this case was and still is a corporation duly organized and existing under the laws of the State of Delaware, owning and operating the steamships "Oakmar", "Flomar", and "Calmar" as general ships in the common carriage of merchandise between Baltimore, Maryland, and Seattle, Washington, and other ports.

3. At all times involved, respondent St. Paul Fire & Marine Insurance Company was a corporation duly authorized to issue insurance within the Commonwealth of Pennsylvania.

4. In November and December, 1940, respondent Calmar Steamship Corporation agreed to carry for libellant from Baltimore, Maryland, to Seattle, Washington, 6,398 cases of No. 10 tin cans of beets under Government form bill of lading.

5. Said agreement was initiated by libellant in two letters dated respectively November 25 and December 9, 1940, each referring to a part of said total of 6,398 cases, and in each of which letters libellant stated as follows:

"These goods are for shipment on Government B/L.

"Under no consideration, are you to load any of these beets on your steamer unless you can furnish the Government with a clean B/L. Please have no misunderstanding regarding this."

6. Respondent Calmar Steamship Corporation accepted the orders of libellant in said two letters and subsequently did issue a clean Government form bill of lading covering the cases hereinafter referred to.

7. Libellant's canned beets were packed at Ontario, New York, and shipped from there in six railroad cars to Baltimore, Maryland.

8. The first two cars, containing 2,000 cases of said canned beets, were shipped from Ontario on November 30 and December 3, 1940. They were loaded onto the S/S "Oakmar", which left Baltimore on December 8, 1940, and arrived at Seattle on January 17, 1941.

9. A third car, containing 1,000 cases, left Ontario, on December 4 and the cases were unloaded from said car at Baltimore on December 14, 1940. Respondent Calmar Steamship Corporation rejected 14 of said cases for the stated reason that they were damaged, and the remaining 986 cases were loaded onto the S/S "Flomar", which left Baltimore on December 15, 1940, and arrived at Seattle on January 20, 1941.

10. The remaining three cars, containing 3,398 cases, left Ontario on December 12, 13 and 14 and were unloaded at Baltimore on December 20, 1940, where respondent Calmar Steamship Corporation rejected 19 cases for the stated reason that they were damaged. The remaining 3,379 cases were loaded onto the S/S "Calmar", which left Baltimore on December 21, 1940 and arrived at Seattle on February 2, 1941.

11. On each of the said three vessels the canned beets were stowed in the wings of No. 4 hold, which is as good a place for stowage of cargo of this nature as could be found on said steamships.

12. Respondent Calmar Steamship Corporation, as required by the instructions of libellant, issued one bill of lading on Government form, dated December 21, 1940, covering the total of 6,365 cases which went forward on said three steamships, and receipting for the cases as in "apparent good order and condition."

13. Said bill of lading contained the following provision:

"Unless otherwise specifically provided or otherwise stated hereon, this bill of lading is subject to the same rules and conditions as govern commercial shipments made on the usual forms provided therefor by the carrier."

There was nothing "otherwise specifically provided or otherwise stated" on said bill of lading.

14. The usual form bill of lading provided by respondent Calmar Steamship Corporation in connection with commercial shipments at said time contained the following clause:

"16. Neither carrier nor vessel shall be liable for any loss, damage or delay * * * arising from any of the following causes: * * * causes beyond the carrier's control; * * * mildew, mould * * * inherent defect or vice propre; * * * insufficiency of package, in strength or otherwise * * * rust, stain, discoloration, * * * or for injuries or soiling of wrappers or containers; * * *".

15. Respondent, Calmar Steamship Corporation, arranged for libellant's cargo to be insured with respondent, St. Paul Fire & Marine Insurance Company, which accordingly issued its three several certificates of insurance covering the shipments of canned beets belonging to libellant.

16. Said insurance covered, among other risks not pertinent here, "loss or damage caused by sweat, fresh water, steam of hold, contact with oil and/or with other cargo and theft, pilferage and non-delivery, all irrespective of percentage."

17. On discharge at Seattle, some cases and cans from each of the three steamships were damaged; cases were found mouldy, cans were found rusted, and labels were found soiled.

18. The rust on the cans and the stain or soiling of the wrappers appeared where the cans were in contact with the wood of the cases.

19. There was no rust, stain or discoloration on the parts of the cans not facing the wood of the cases.

20. The mould on the cases was not uniform, but some panels were mouldy whereas other panels immediately adjacent to them were not. The mould was due to excess moisture in the wood.

21. There was no damage to the beets, but the mould, rust, stain and soiling caused libellant damage to the extent of the cost of reconditioning the shipments because the consignee would not accept them until reconditioned.

22. As the result of the damage it was necessary for libellant to expend the sum of $4,129.21 in reconditioning its property.

23. The wooden cases involved in this libel were purchased by libellant from a manufacturer in Brewton, Alabama. They were constructed of gum veneer and may be described as "four in one boxes" and as wire strapped wooden cases. The manufacturer shipped these boxes in two carload lots, on November 14 and November 30, 1940, to the cannery at Ontario, New York, which stored them in their warehouse on the second floor of the cannery until they were packed and shipped in six carloads on November 30, December 2, 4, 12, 13 and 14, 1940, consigned to Calmar Steamship Corporation at Baltimore.

24. The only damage to the cans came from mould caused by excessive moisture inherent in the gum veneer of the wood from which the boxes were made and there was no wetting from external sources.

## Discussion

As against the respondent carrier, Calmar Steamship Corporation, libellant takes the position that it has established a prima facie case: That having shown receipt of

the merchandise in good order and delivery in damaged condition, the burden is on the carrier to prove that the cause of the damage was one for which it is not responsible, either by law or under exception in the contract of carriage; the carrier having failed to outweigh the burden by its evidence, it is liable. Clark v. Barnwell, 12 How. 272, 280, 53 U.S. 272, 280, 13 L.Ed. 985; The Propeller Niagara v. Cordes, 1858, 21 How. 7, 21, 62 U.S. 7, 21, 16 L.Ed. 41; Schnell v. The Vallescura, 1934, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373.

The carrier contends, however, that the damage claimed arose from a cause excepted in the bill of lading and therefore libellant cannot recover, having failed to prove negligence. The Isla De Panay, 2 Cir., 1923, 292 F. 723, affirmed 1925, 267 U. S. 260, 45 S.Ct. 269, 69 L.Ed. 603; The Malcolm Baxter, Jr., 1928, 277 U.S. 323, 334, 48 S.Ct. 516, 72 L.Ed. 901. It is asserted, on the contrary, that the damage arose out of the nature of the wooden cases, for which the carrier is not liable. 27 Stat. 445 (1893), 46 U.S.C.A. § 192.

A recital in the bill of lading that the shipment is in apparent good order and condition is only prima facie evidence of the fact. 27 Stat. 445 (1893), 46 U.S.C.A. § 193. As a receipt, it is not contractual nor does it constitute a warranty as between the immediate parties. Amerlux Steel Corporation v. Johnson Line, 9 Cir., 1929, 33 F.2d 70. Hence the carrier is free to prove the contrary. The Delaware, 1871, 14 Wall. 579, 81 U.S. 579, 601, 20 L. Ed. 779; Amerlux Steel Corporation v. Johnson Line, supra; The Georgian, S.D. Fla., 1933, 4 F.Supp. 718, affirmed, 5 Cir., 1935, 76 F.2d 550. Moreover such recital refers to external condition only. The Niel Maersk, 2 Cir., 1937, 91 F.2d 932, 933; Albers Bros. Milling Co. v. Hauptman, 9 Cir., 1938, 95 F.2d 286, 287; The Georgian, supra; The Magdapur, S.D.N.Y., 1942, 46 F.Supp. 517. Consequently the libellant bears the burden of establishing actual good order and condition at the time of delivery to the carrier. The Niel Maersk, supra; Albers Bros. Milling Co. v. Hauptman, supra; The Chester Valley, 5 Cir., 1940, 110 F.2d 592, 594.

The libellant has not overcome this burden. The parties agree that the effective cause of the damage to the cargo was the existence of excess moisture in the wood of the cases in which the canned beets were packed. Libellant, in its briefs, admits it has not proved, and cannot prove, the cause of the excess moisture. In an attempt to establish actual good condition the libellant, it may be assumed, has shown that no mould was present on the cases at the time of delivery to Calmar. This, however, is insufficient, for it is evident from the record that excess moisture may exist without evidencing mould for a long period of time depending upon atmospheric conditions. It is asserted that, in the absence of proof that moisture was present at the time of shipment, it is a necessary conclusion that it got into the wood during the voyages. But this is not true when the burden is on the libellant to prove actual good condition at the time of delivery to the carrier, for where the burden rests, he who undertakes to carry it must do more than create a doubt which the trier of fact is unable to resolve. Commercial Molasses Corporation v. New York Tank Barge Corporation, 1941, 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89. Where the cargo owner fails to establish actual good condition, Schnell v. The Vallescura, supra, on which libellant relies, is distinguishable and not applicable, since in that case it was assumed that the carrier received the merchandise in actual good condition. The Niel Maersk, supra; Albers Bros. Milling Co. v. Hauptman, supra; The Chester Valley, supra.

This issue and the question raised by the respondent carrier with respect to inherent defect in the wood may be treated as not dispositive of liability for the damage, since the way was still open to the libellant to show that excess moisture in the wood would not have produced the injury and loss if the carrier had not been negligent. S. L. Shepard & Co. v. Agwilines, Inc., 4 Cir., 1942, 130 F.2d 67, 69.

An examination of the record fails to reveal any evidence of negligence on the part of the carrier. The cases of canned goods were stowed in the wings of the No. 4 lower hold of each vessel. There is no doubt that this was the best place for stowing this merchandise. Furthermore, H. R. Enderslund, master of the S. S. Calmar, testified, by deposition, that the ship is equipped with "mushroom" type ventilators which are always open, but that they are covered with canvas during "real bad" weather. The captain had no recollection of anything "extra bad" about the voyage. He also testified that the mushroom venti-

lators take care of all ventilation, but that, as a rule, the hatches are opened, if the weather is fit, where it is necessary to avoid extreme temperature changes in the hold which might cause sweating. Generally the hatches are opened when the vessel reaches the West Coast, for about 2½ to 3 days, from Lower California up the coast to Los Angeles, there being a change in the water there. Since the voyage from Baltimore to Seattle requires passing through the Panama Canal several changes in water and air temperature occur, and a certain amount of heat in the hold may be unavoidable at a particular time. After the cargo was discharged at Seattle, the Captain went through the holds and found No. 4 lower hold to be dry, neither sweat nor water being discernable.

It is worthy of note that there was no damage of any kind to the beets themselves. There is no evidence that custom or practice required more ventilation or different treatment than that given this cargo by the ship and its officers: nor is there evidence that the wood used in the manufacture of the boxes in which the cans were packed required special care, and there is no reason to conclude that Calmar should have been on notice of the susceptibilities of the particular kind of wood used.

That the damage came about through a latent or inherent defect, rather than negligence of Calmar, is evident. According to the depositions of several employees of the box manufacturer, the wood used in the boxes here involved was a gum veneer 3/16 of an inch thick. The wood is placed in live steam vats for about 15 hours, when it is cut into the desired thickness and then placed in an automatic dryer where it remains for about forty to forty-four minutes. About every thirty minutes a piece is weighed after it comes out of the dryer to determine the moisture content, but the wood already passed is not checked or returned to the dryer in the event a piece is found to contain too much moisture on being weighed. About five percent of the time the wood comes out of the dryer too moist. Moreover, about twenty percent of the wood used is purchased outside, and only a certain number of bundles are examined. If the boxes are moist when placed in the storehouse, only those pieces exposed to the air will dry. However, when a shipment is ready, about twenty percent is weighed to determine the average weight per box in order to calculate the railroad rate. In addition, the ship-

ping clerk and warehouse foreman of the canning concern in Ontario, New York, testified, by deposition, that the bundles of boxes were stored in the warehouse on the second floor of the cannery, where the heat was as much as 90 to 100 degrees because of the steam canning process in progress on the floor below.

Not every case in each shipment was mouldy, and not every panel in each damaged box was affected by mould, but occasionally one panel was affected whereas the panel immediately adjacent to it, on the same box, was not. Also, the damage to the labels, by staining, and to the cans, by rust, appeared only where there was contact with the infected wood. It may also be taken into consideration that these irregularities were peculiarly uniform despite the fact that there were three shipments on three different vessels. Moreover, Mr. E. S. Tarr of Seattle, Washington, a surveyor and appraiser of long experience, testified, by deposition, that he had examined the shipments of canned beets following their discharge at Seattle, and observed their condition as stated. According to the stowage plan of the S. S. "Flomar", which was admitted in evidence without objection, a shipment of canned pork and beans was stowed next to the canned beets. Mr. Tarr examined this shipment, consisting of about 775 cases, and found about 270 were mouldy on one side only. The cans were rusted and labels stained only where they were in contact with the mouldy side of the containers. Mr. Tarr found no water stains or evidence of sweat or condensation of moisture on either shipment of canned goods.

Mr. Tarr was of the opinion that the damage to the canned beets was caused by excess moisture in the wooden cases, and that the damage to the canned pork and beans was caused by stowage close to the boxes of canned beets so that moisture was absorbed from them.

Mr. Leslie Hefferline, assistant chief chemist and business manager of the Laucks Laboratories, Inc., of Seattle, Washington, a firm of analytical chemists and surveyors, examined two cases of the canned beets. These two cases were selected by another employee of Laucks Laboratories, Inc., in the presence of Mr. Tarr, who testified that they were representative of the shipments. Mr. Hefferline, testifying by deposition, described the

condition of the cases as already given and also stated he found no evidence of their being wetted from external sources. His opinion of the cause of the damage was the same as Mr. Tarr's. Mr. Hefferline, having had experience with gum veneers in connection with laboratory research work, described the wood used in the boxes, in which the beets were packed, as being a sap gum veneer which is porous and has a tendency to pick up moisture. The length of time for the mould to develop depends on many factors, especially humidity, which may encourage or arrest growth.

The libellant has objected to the testimony of these men on the ground that they lack the qualifications for standing as experts. With respect to Mr. Hefferline, such objection is overruled. As to Mr. Tarr, while he stated he had no familiarity with absorbent qualities of gum veneer, he has, nevertheless, surveyed and examined damaged cargoes for 28 years, has examined many shipments from the East Coast, and has had much experience with canned goods. Conditions such as condensation of moisture, ship's sweat and water in the hold are identifiable and Mr. Tarr was competent to state whether he found evidence of such conditions. He is also competent to express an opinion, having in mind the conditions enabling development of mould, as to whether such mould was brought about by water, sweat, condensation of moisture, or another source.

Assuming that the merchandise was in actual good condition at the time of delivery to Calmar, and that no inherent defect existed in the wood of the boxes, the libellant, nevertheless, is not in a position where recovery is permissible.

The libellant asserts that the contract of carriage consisted of letters dated November 25 and December 9, 1940, orally accepted by Calmar, and the Government bill of lading. The Government bill of lading, it may be noted here, contained a provision subjecting it to the rules and conditions made on the usual bill of lading of the carrier, unless otherwise provided (Findings of Fact No. 13). Despite the lack of any contrary notation on the Government bill of lading, the libellant urges that the conditions stated on the bill of lading usually issued by the carrier are not to be incorporated into the contract of carriage because of the specific statements in the letters of November 25 and December 9, 1940, to the effect that no goods may be loaded unless Calmar could supply the Government with a "clean" bill of lading (Findings of Fact No. 5).

The description "clean" bill of lading, in general, imports that the goods are to be safely and properly secured under deck. The Propeller Niagara v. Cordes, supra; The Delaware, supra; St. Johns N. F. Shipping Corporation v. S. A. Companhia Geral Commercial, 1923, 263 U.S. 119, 123, 44 S.Ct. 30, 68 L.Ed. 201; The Kirkhill, 4 Cir., 1900, 99 F. 575. However, broadly speaking, it may be said that a "clean" bill of lading is one which contains nothing in the margin qualifying the words of the bill of lading itself. The Isla De Panay, supra; see Stirnimann v. The San Diego, S.D.N.Y., 1944, 55 F.Supp. 798, 800.

In the case at bar, nothing appears on the Government bill of lading to qualify its printed terms, and according to its printed terms, the conditions in Calmar's usual bill of lading are incorporated therein. The bill of lading issued by Calmar, therefore, is a "clean" Government bill of lading; it is in compliance with the libellant's letters of November 25 and December 9, 1940, and it is none the less so because of the incorporation.

The instant case, in this respect, is similar to the case of The Idefjord, 2 Cir., 1940, 114 F.2d 262, 264, certiorari denied Den Norske Amerikalinje A/S v. Blumenthal Import Corporation, 311 U.S. 707, 61 S. Ct. 175, 85 L.Ed. 459. There, printed on the bill of lading were the small capital words "Subject to All the Terms and Conditions Contained in the Bills of Lading at Present in Use By: Messrs.——." The blank was completed with the typewritten words, "The oncarrying line of steamers." The Court considered this to be a "clean" bill of lading effectively incorporating the conditions contained in the bill of lading used by the oncarrying steamship company, and, as such, negatived on deck carriage.

Calmar's usual bill of lading excepted the carrier and vessel from liability for damage caused by mould, rust and discoloration. (Findings of Fact No. 14). There is no doubt that the damage comes within this description. The respondent carrier, having satisfied the burden of bringing the damage within an exception in the bill of lading, the burden

falls on the libellant to prove negligence on the part of the carrier in order to recover. This principle of law is well settled; the cases have already been cited. The libellant has failed, as I have already concluded, to show any negligence on the part of the carrier.

The libellant, however, points out that the exceptive provision refers to *causes* of damage. It earnestly contends that mould, rust and stain are *effects* rather than causes.

In Schnell v. The Vallescura, supra, on which the libellant bases its argument, the Supreme Court said, 293 U.S. 296 at page 304, 55 S.Ct. at page 196, 79 L.Ed. 373:

"It is commonly said that when the carrier succeeds in establishing that the injury is from an excepted cause, the burden is then on the shipper to show that that cause would not have produced the injury but for the carrier's negligence in failing to guard against it. Such we may assume the rule to be, at least to the extent of requiring the shipper to give evidence of negligence where the carrier has sustained the burden of showing that the immediate cause of the loss or injury is an excepted peril. * * *

"Here the stipulation was for exemption from liability for a particular kind of injury, decay. But the decay of a perishable cargo is not a cause; it is an effect. It may be the result of a number of causes, for some of which, such as the inherent defects of the cargo, or, under the contract, sea peril making it impossible to ventilate properly, the carrier is not liable. For others, such as negligent stowage, or failure to care for the cargo properly during the voyage, he is liable. The stipulation thus did not add to the causes of injury from which the carrier could claim immunity. It could not relieve him from liability for want of diligence in the stowage or care of the cargo."

The libellant interprets this statement as placing the burden, here, on the respondent carrier of establishing the essential cause of the mould, rust and stain, that is, the source of the moisture and when it existed. However, the Supreme Court, in that case, also stated, 293 U.S at page 306, 55 S.Ct. at page 196, 79 L.Ed. 373:

"It is unnecessary for us to consider whether the effect of the clause is to relieve the carrier from the necessity, in the first instance, of offering evidence of due diligence in caring for a cargo received in good condition, and delivered in a state of decay. * * * For here want of diligence in providing proper ventilation is established and it is found that the failure to ventilate has caused the damage."

Briefly summarized, Schnell v. The Vallescura does not help the libellant here: it merely decides that the exceptive provision does not relieve the carrier from liability for negligence. In this case, however, the libellant has failed to establish the cause of the excess moisture, or to adduce evidence to support a finding of negligence.

On the question which was not answered in the Vallescura case, the Supreme Court had already declared itself in the case of The Folmina, 1909, 212 U.S. 354, 29 S.Ct. 363, 53 L.Ed. 546, 15 Ann.Cas. 748. There it was said, 212 U.S. at page 362, 29 S.Ct. 365:

"Of course, where goods are delivered in a damaged condition plainly caused by breakage, rust, or decay, their condition brings them within an exception exempting from that character of loss, as the very fact of the nature of the injury shows the damage to be prima facie within the exception, and hence the burden is upon the shipper to establish that the goods are removed from its operation because of the negligence of the carrier."

The effect of the exceptive provision is explained in more detail in The Patria, 2 Cir., 1904, 132 F. 971, at page 972:

"It is, no doubt, the rule, as appellant contends, that, when the damage is manifestly of the sort excepted, the ship is under no obligation to show the promoting cause. To illustrate, if the exception is 'damage caused by peril of the sea', and the cargo is landed drenched with salt water, it will be for the ship to show that the salt water found access to the cargo through a peril of the sea; but if the exception is 'damage by breakage', and the article arrives broken, the ship is not required to show how it got broken—although the libellant may show that negligence of those on the ship, or of those who stowed her or discharged her, caused the break, and, showing that, may recover. If the sole damage to the cargo in the case at bar were manifestly decay, and the language of the exception were, as the respondent states in his brief, 'for decay caused by inherent defect,' the ship would have the burden of showing that the decay was caused by inherent defect. If,

however, the sole damage were manifestly decay, and the language of the exception were, as given in the bill of lading, 'not responsible for damage occasioned by decay of any kind,' the appellant would be right in his contention, and, the cause of the decay not being shown to be negligence on the part of the ship, the libel should be dismissed."

It is noteworthy that both The Folmina and The Patria were cited by the Supreme Court in the Vallescura case.

As against the respondent insurer, the libellant contends: That although it was not able to prove the cause of the moisture in the wood, that it has proved that the cargoes were in good condition when received on board the vessels and that conseqently, in the absence of proof that moisture was present at the time of the shipment, it is a necessary conclusion that it got into the wood during the voyages while covered by the insurance; since the insurance covered any possible source of moisture while on the vessels.

However, the rule is well settled that the insured bears the burden of bringing the damage within the risks insured against. Swan v. Union Ins. Co., 3 Wheat. 168, 4 L.Ed. 361. Even assuming that the libellant has proved that the cargoes were in good condition at the time of delivery to the carrier, it bears the burden of bringing the loss within the risks insured against—damage caused by sweat, fresh water, steam of hold, contact with oil and/or with other cargo. Admittedly, the libellant has failed to establish the cause of the moisture, and therefore, it has failed to carry its burden. The libellant's view that the insurance covered any possible source of moisture during the voyage is not maintainable. The policy does not, for example, cover damage by salt water. Finally, for reasons already stated, I am of the opinion that the libellant has not successfully established that no moisture was present in the wood of the boxes prior to coverage of the shipments by the insurance.

Accordingly, I state the following

### Conclusions of Law

1. The Government form bill of lading issued to libellant constituted the contract of carriage.

2. The bill of lading covering libellant's cases of canned beets incorporated the conditions of Calmar Steamship Corporation's usual form bill of lading, including exemptions from liability for damage caused by mould, rust, stain, discoloration and soiling of wrappers.

3. The proof that libellant's damage was caused by mould, rust and staining or soiling of labels, without any evidence of negligence on the part of the carrier, established a complete defense for respondent Calmar Steamship Corporation.

4. Libellant has failed to sustain the burden of proof incumbent upon it of establishing that the loss was due to a peril insured against by respondent, St. Paul Fire & Marine Insurance Company.

5. Respondent, St. Paul Fire & Marine Insurance Company, is not liable under the insurance coverage granted to libellant in this case for loss or damage proximately caused by inherent vice, defect or infirmity of the subject-matter insured.

6. Respondent Calmar Steamship Corporation is entitled to a decree in its favor dismissing the libel against it, with costs.

7. The libel against respondent, St. Paul Fire & Marine Insurance Company, should be dismissed with costs.

Orders may be submitted in accordance with this Opinion.