**THE CIANO.**

**NAVARRO v. DOE et al.**

**No. 43 of 1945.**

District Court, E. D. Pennsylvania.

Dec. 16, 1946.

Rawle & Henderson, of Philadelphia, Pa., for respondents.

KALODNER, Circuit Judge.

This is a proceeding in admiralty to obtain requital for damage to a shipment of paprika which was carried from Alicante, Spain, to Philadelphia, Pa., on the "S.S. Ciano."

The Sociedad Metalurgica Duro Felguera, a Spanish corporation, entered its appearance as owner and operator of the "Ciano" and it is chiefly against that company that the libellant presses his claim. Jacob A. Mauch and Joseph Klemm, individually and co-partners trading as Rice, Unruh & Co., in Philadelphia, are made respondents on the ground of agency, and also are garnishees, having credits of the Spanish company which are stipulated to amount to $5600. One Emilio Huart is also named as a respondent. Service was had on Rice, Unruh & Co. as agent for Huart, and also as garnishee, but Rice, Unruh & Co. denied the agency as well as the assertion that it held credits of Huart.

The issues for determination relate to when and how the shipment of paprika was damaged, and to the adequacy of certain proofs of loss. The law does not appear to be in dispute; rather a resolution of the evidence is necessary, and, of course, the application of the law to the facts will determine the outcome of the controversy.

The evidence may be summarized as follows. On a bill of lading of Emilio Huart, the captain of the "Ciano," on March 25, 1944, acknowledged the receipt in apparent good order and condition of 500 bags of pure Spanish paprika, to be carried from Alicante, Spain, to Philadelphia. The bill of lading had no bad order notations. When the paprika was discharged at Philadelphia, 235 of the 500 bags were found to have been damaged.

The evidence is clear that at Alicante, the bags of paprika were stowed over dunnage in the tween deck of No. 2 hold, occupying an area extending from the forward bulkhead aft for about three metres, being piled about seven or eight tiers high reaching to the top of the tween deck. Also loaded at Alicante were bags of thyme. At the star-

Conlen, LaBrum & Beechwood, of Philadelphia, Pa., for libellant.

board forward corner of the hold there was a ventilator.

The "Ciano" sailed from Alicante on March 25, 1944, and on March 27, 1944, arrived at Seville where it remained until April 5, 1944; it arrived next at Cadiz on April 6, 1944, and remained there, according to the log, until April 14, 1944.

It was at Seville that barrels of olives were taken aboard, and at Cadiz, barrels and cases of wine. However, the testimony clearly establishes that at Seville, the cargo of paprika was shifted from the No. 2 tween deck to the No. 2 lower hold. When the vessel left Cadiz, the paprika was in the following position: Just aft of the center of No. 2 hold, below the tween deck and directly beneath the hatch opening except for the edge of the stow; aft of the bags of paprika, and on the sides or wings were bags of thyme, which thus surrounded the paprika on three sides and were between the paprika and the after ventilator; forward of the paprika was a temporary wooden bulkhead running athwartships; forward of this bulkhead were cases of wine and bales of rabbit skins; below the paprika, under dunnage, were barrels of olives; above the paprika were the hatch boards on top of which were, in the tween deck, barrels of wine, barrels of olives and cases of wine; above these cork was stowed.

The "Ciano" arrived at Gloucester, New Jersey, on May 4, 1944, where she discharged her cargo of cork; on May 15, 1944, she moved to Pier 24, Philadelphia, a covered pier, and on May 16, 1944, discharged her cargo of paprika.

The log of the "Ciano" contains incomplete entries with respect to the weather during the trip from Alicante to Seville. Both the Captain and the Chief Officer testified that it did not rain at Alicante. They could not recall, however, whether it rained on the trip from Alicante to Cadiz, or whether it rained at Seville or at Cadiz. The weather during the voyage across the Atlantic was usual, there being squalls and rain. At Seville and Cadiz, the hatches were open during the day, and on the voyage from Cadiz to Philadelphia they were open for about ten days. The ventilators were closed with wood when it rained.

The respondents' cargo surveyor, Bryant, was present when the paprika was discharged at Philadelphia. He testified that when he first observed the paprika in the lower hold, before any was removed, he saw only three or four stained bags in the top tier of the stow. As the paprika was discharged he observed that the greater number of stained bags appeared among the lower tiers of the stow. The inference from this fact is that these bags were originally in the top tiers of the stow in the tween deck prior to the shifting to the lower hold which took place at Seville, previously mentioned. Some of the bags were stained and discolored on the flat sides, some on the sides and others on the ends.

Bryant also testified he examined several of the damaged bags and concluded that the stains and discolorations were due to a "general wetting"; on touching some of the stains he found them to be dry, and concluded that the stains were old and had dried. He found no evidence in the hold of condensation or sweat. The tween deck hatch boards were dry, and the temporary wooden bulkhead forward of the paprika was also dry. However, his notes reveal the statement "Bales rabbit skins, CEW HH. Some wet wood in evidence."

On May 18, 1944, the libellant personally examined the paprika at the pier. He found that about half the bags were stained and discolored, and that some stained areas were wet.

The paprika was removed to New York City in bond and placed in a warehouse. Of the 500 bags, 235 were set aside as being stained and discolored. On June 5, 1944, an examination was made by two surveyors, Frank Gunn, for the respondents, and James Naylor, for the libellant. Several facts are clearly established according to their testimony: the paprika was packed in double bags made of burlap, and the burlap was new; the damage was external and evident; it was caused by fresh, as distinguished from salt, water; the paprika immediately beneath the stains was bleached and hardened or caked and

this could be felt from the outside of the bags; beneath the caked paprika, in some cases, there was bleached and "mushy" or damp paprika, caused by excessive moisture and resulting from the wetting which also produced the stains. The testimony further supports the conclusion that the damage was not the result of ship's sweat or condensation in the lower hold.

There could be no doubt that the burlap bags were new, although it was testified that where there were stains and discolorations the characteristic sheen of new burlap was lost and from a distance, on seeing the stained portions of the bags, particularly the ends, one might conclude that the bags had had prior use. In this connection, it should be noted that the Chief Officer of the "Ciano," who saw some of the bags of paprika during the loading at Alicante, and the Master, who saw the paprika in the hold, testified by deposition, that the bags appeared to have been used previously. Nevertheless, the Master also saw the paprika after its discharge at Philadelphia, and he testified that the bags then were stained and discolored.

Finally, the time element with respect to the damage was not settled by the surveyors. Naylor testified that it was comparatively recent. Gunn could say, at most, that it probably occurred prior to the stowage in No. 2 lower hold. The evidence further indicated that the time required to dry the wet bags would vary with atmospheric conditions in the hold and with the weather. Without knowing these factors, it was impossible to determine the issue.

■ The instant case falls within the scope of the Carriage of Goods by Sea Act, 49 Stat. 1207 et seq. (1936), 46 U.S.C.A. § 1300 et seq., even though the bill of lading was issued in Spain, 46 U.S.C.A. § 1312. That act provides that the bill of lading shall show, among other things, the apparent order and condition of the goods, and that the bill of lading shall be prima facie evidence of the receipt by the carrier of the goods as therein described. Sections 3(3) (c) and 3(4), 46 U.S.C.A. §§ 1303(3) (c) and 1303(4). Further, the carrier and the ship are relieved of re-

sponsibility for losses arising from certain enumerated causes of damage and from any causes arising without actual fault and privity of the carrier or without the fault of its agents or servants, but the burden of proof is on the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants of the carrier contributed to the loss or damage. Section 4(2), 46 U.S.C.A. Section 1304(2).

■ By introducing in evidence the bill of lading with the recitation of receipt for shipment in good order and condition, the libellant has thus prima facie established such condition. However, respondents correctly point out that such recitation in the bill of lading admits, only, that insofar as inspection of the outside of the cargo could indicate, it was in such condition: it relates to *external* or *apparent* order. Albers Bros. Milling Co. v. Hauptman, 9 Cir., 1938, 95 F.2d 286; Niel Maersk, 2 Cir., 1937, 91 F.2d 932; Roberts & Co. v. Calmar S.S. Corp., D.C. E.D.Pa., 1945, 59 F.Supp. 203. Having this in mind, they seek to cast upon the libellant the obligation of showing the actual condition of the cargo at the time of delivery to the "Ciano". Niel Maersk, supra; Roberts & Co. v. Calmar S.S. Corp., supra. It is asserted that the stains on the bags do not in themselves show that the contents were in other than *apparent* good order and condition. Citing the experience of their surveyor, Bryant, who testified that he had seen a whole shipment of bran in stained bags without damage to the contents, and relying on the evidence that the dampness in the paprika was found beneath the dried out caked areas, it is contended that the damage herein was not apparent from outside inspection, that is, it was internal damage; hence, bad order notations on the bill of lading were uncalled for.

■ This position, in my opinion, is untenable. The condition of the container, it is true, is not always coincident with the actual condition of the contents. Doubtlessly, an experienced surveyor may be able to recall instances where damaged

containers held undamaged goods. So also, the damage to the container may be wholly unconnected with the damage to the contents. Cf. The Carso, 2 Cir., 53 F.2d 374, 1931 A.M.C. 1497, 1500, where boxes of cheese were broken, but the cheese was infected with vermin. Nevertheless, the external condition of the cargo is a silent, but patent, testimonial to its *apparent* good order and to say otherwise would effectively destroy the value of the required acknowledgment in the bill of lading. If the containers, on external inspection, revealed nothing, the carrier would be safe in its assumption that the contents were in good order, but where the containers visibly disclose damage, it could not justifiably say that the contents were unaffected unless that also were apparent from external inspection.

Respondents' assertion that the damage was internal ignores the clear evidence that the stains were evident and obvious, that the paprika in the area of the stains was bleached and caked, and that in some instances the paprika below the caking was damp. Not only was the condition visible but the ordinary application of the sense of touch would disclose the caked condition of the paprika. Moreover, it was incontroverted that the cause of the damage was external.

The evidence, therefore, adequately refutes the suggestion of the respondents and establishes the connection between the apparent condition and the actual condition of the shipment. The burden, accordingly, rests with the respondents to controvert the bill of lading, or to show that the damage did not occur while in the carrier's custody, or that the damage falls within an exception in the bill of lading or the applicable statute. Carver's Carriage of Goods by Sea, 8th Ed., 1938, sections 68, 73.

That the damage existed at the time of delivery of the paprika to the "Ciano" and that the damage could not have occurred on board the "Ciano" constitute the respondent's alternative defenses.

With reference to the first defense, the libellant seeks to persuade the court that the respondents ought not to be permitted to contravert the bill of lading.

It is well settled that ordinarily the carrier is free to contradict the acknowledgement of apparent good order, since the recital is neither contractual nor a warranty. Roberts & Co. v. Calmar S.S. Corp., supra, 59 F.Supp. at page 207. Nevertheless, special circumstances may operate as an estoppel. See The Carso, supra. However, assuming a misrepresentation, it is an essential element in an estoppel to prove action in reliance thereon, as well as injury resulting from such reliance. Williston, Contracts (1937) Section 1508; see The Carso, supra, 53 F.2d at pages 377, 378, 1931 A.M.C. at pages 1502, 1503. The record here is devoid of any evidence that the libellant acted in reliance on that representation, and consequently, there is no legal obstacle to the consideration of respondents' evidence with respect to the condition of the paprika when taken aboard the "Ciano."

The contention that the apparent order of the shipment on delivery to the "Ciano" was the same as the condition on discharge at Philadelphia rests upon the testimony, by deposition, of the Captain and the Chief Officer. As before noted, the Captain stated that he saw the bags of paprika in the hold at Alicante, and the bags appeared to be used. The Chief Officer agreed with the Captain. It is now urged, in effect, that what they saw were in fact stained bags.

The surveyors indicated, indeed, that the stained areas of the bags did not have the characteristic sheen of new burlap. Nevertheless, there was no doubt that the unstained bags were new, that the stained bags were also new and that the unstained portions thereof manifested newness. There is clearly a difference between a used bag and a stained new bag and that difference was particularly evident in this case. Further, the difference was evidently recognized by the Captain: although he stated that when he saw the bags at Alicante they appeared used, he also stated that when he saw them on the dock at Philadelphia they were stained and discolored.

In my opinion, it is a reasonable assumption that experienced seamen such as the Captain and the Chief Officer would

be aware of the difference between used bags and stained new bags; especially in the situation here involved. Obviously the Captain was. It is also reasonable to assume that if the bags were stained and discolored at Alicante as they were at Philadelphia, notations would have been made on the bills of lading. See Stirnimann v. The San Diego, 2 Cir., 1945, 148 F.2d 141; The Solveig, D.C.N.D.Cal., 1914, 217 F. 805. Moreover, although it is difficult to determine credibility when the testimony is submitted in the form of depositions, account may be taken of the tendency to "stick by the ship." I cannot agree, therefore, that this is sufficient evidence to establish bad order of the shipment at the time of delivery to the "Ciano."

The respondents next assert that the damage must have occurred prior to receipt of the cargo on board the "Ciano" and that it could not have happened on the "Ciano."

The very best evidence for the respondents as to when the damage happened was given by their surveyor, Gunn, who testified that in his opinion it could not have happened while the paprika was in stow in the No. 2 lower hold. This patently leaves open the period from the time it was placed in the 'tween deck at Alicante to the time it was shifted at Seville. The fact that the paprika, for the most part, had dried by the time it reached Philadelphia is inconclusive, since the surveyors agreed that whether it would dry depended on factors not proved by the respondents.

While the preponderance of the evidence eliminates certain possible causes of damage, as condensation and ship's sweat in lower hold No. 2, it does not lead to the conclusion that the damage could not have occurred while the paprika was within the range of the carrier's duty to properly and carefully handle, carry, keep and care for it. See 46 U.S.C.A. § 1303(2). The condition of the cargo of thyme in the No. 2 lower hold on discharge at Philadelphia is not helpful particularly in view of the lack of evidence as to the location of the thyme in the tween deck. Moreover, it can only be assumed that the thyme in the No. 2 lower hold, identified in the cargo chart as "sacos hierbas," was the same thyme that was originally stowed in the tween deck, there being no evidence as to what transpired at Seville. For example, the stowage chart discloses that barrels of olives, taken on at Seville were stowed in the No. 1 hold under "sacos hierbas," which were taken on at Alicante; the same is true with respect to the No. 4 lower hold. Finally, consideration may be given to the discovery of some wet wood in the No. 2 lower hold.

Under the circumstances, the only reasonable conclusion is that the evidence adduced by the respondents discloses that they cannot account for the damage to the paprika.

■ The libellant's prima facie case of receipt on the "Ciano" in good condition must stand. The cargo was delivered in bad condition. The respondents have failed to show either that the damage did not occur aboard the vessel, or that however it occurred, it was not due to or contributed to by, the fault of the carrier, its agents or its servants. Accordingly the libellant is entitled to recover herein.

■ With respect to the matter of damages, the libellant satisfactorily proved the cost incident to the reconditioning of the paprika in the amount of $552.29, and the cost of new single burlap bags in the amount of $77.55. The respondents do not take issue with these items. Also, it was shown that the reconditioned paprika, 25,670 net pounds in all, was sold at 29 cents a pound, or $7,444.30. Both the libellant and his surveyor, Naylor, testified that this was the best price obtainable.

The libellant testified further, that the market value of paprika of the kind herein involved was 45 cents to 49 cents a pound at the time of the delivery of the paprika to him at Philadelphia. He could not, however, recall having made any sales of paprika at that time, although some of the undamaged paprika from this shipment was sold at 48 cents a pound. The respondents argue that this is inadequate evidence. Nevertheless, the libellant specialized in importing spices, including paprika, and had approximately ten years' experience in that field. I find his testimony worthy of credence, and in my opinion, it is sufficient. The libellant requests, and is accordingly

entitled to recover, in addition to the afore-mentioned losses, his loss of profit of $4,188.20—45 cents a pound for 25,850 net pounds of paprika, or $11,632.50, less $7,444.30, the sum realized on the sale of 25,670 net pounds of reconditioned paprika at 29 cents a pound. It may be noted, parenthetically, that the difference of 180 pounds is accounted for by the reconditioning process. This loss was, on the evidence, normal and reasonable.

The cause having been heard by the Court without a jury, on the basis of the pleadings and evidence, I make the following:

### Findings of Fact

1. Libellant, Jose Navarro, with offices at 11 Broadway, New York, N. Y., was at all material times the owner of the shipment of paprika which is the subject of this libel.

2. Respondent, Sociedad Metalurgica Duro Felguera, a Spanish corporation, was at all times material hereto the owner and operator of the steamship "Ciano."

3. Respondents, Jacob A. Mauch and Joseph Klemm, a co-partnership trading as Rice, Unruh & Co., with offices in Philadelphia, Pa., acted as steamship agents for the "Ciano" while she was in the port of Philadelphia at the time the shipment of paprika here involved was discharged.

4. On March 25, 1944, at Alicante, Spain, Captain F. Sarria, of the steamship "Ciano," executed Bill of Lading No. 4 acknowledging the receipt on board in apparent good order and condition of 500 bags pure Spanish paprika for carriage from Alicante to Philadelphia, Pa. No bad order notations appear on the bill of lading.

5. At Alicante, the 500 bags of paprika were stowed in the forward section of the No. 2 tween deck from the forward bulkhead aft for three metres, filling the height of the tween deck space. Bags of thyme were also loaded at Alicante.

6. The "Ciano" sailed from Alicante on March 25, 1944, and on March 27, 1944, arrived at Seville, where barrels of olives were taken aboard. Leaving Seville on April 5, 1944, she reached Cadiz on April 6, 1944, and remained there until April 14, 1944. At Cadiz barrels and cases of wine were loaded. On May 4, 1944, the "Ciano" arrived at Gloucester, New Jersey, where her cargo of cork was discharged. On May 15, 1944, she reached Pier 24, Philadelphia, a covered pier, and on May 16, 1944, she discharged the cargo of paprika here involved.

7. While at Seville, probably on April 1 or 2, 1944, the 500 bags of paprika were shifted from the tween deck to the No. 2 lower hold, where they were stowed just aft of the center of the hold immediately under the hatch except for the edge of the stow. Below the paprika, under dunnage, were barrels of olives. Aft of the paprika, and on the sides, were bags of thyme, identified in the cargo chart as "sacos hierbas." The nearest ventilator was about 5 metres aft of the paprika. Forward of the paprika were cases of wine and bales of rabbit skins, which were separated from the paprika by a temporary wooden bulkhead. Above the paprika were the hatch boards, on top of which were stowed wine and cork.

8. The log of the "Ciano" does not contain a complete record of the weather during the trip from Alicante to Cadiz. It did not rain at Alicante. Usual weather, including squalls and rain, was experienced on the transatlantic voyage from Cadiz to Philadelphia.

9. The Captain saw the paprika in the tween deck at Alicante and the bags appeared to him to have been used previously. He saw the paprika again on the dock at Philadelphia, when the bags appeared stained and discolored. The Chief Officer saw the paprika at times while it was being loaded at Alicante, and the bags appeared to him to have had prior use.

10. At Philadelphia, the cargo surveyor noticed several stained bags on the top of the stow of paprika in the hold. As the bags were removed, he saw others stained, but most of the stained and discolored bags came from the lower tiers of the stow. Unstained bags were intermixed with the stained bags. The stains and discolorations were on the flat sides of some bags, on the sides of some, and on the ends of others. He felt some stained areas and found them dry. He found some wet wood in the No. 2 lower hold.

11. On May 18, 1944, the libellant examined the shipment of paprika on the dock and found numerous stained and discolored bags, some of which felt wet or damp. He sent a notice of claim to Rice, Unruh & Co. on the same day.

12. Delivery of the paprika was accepted by the libellant on May 24 or 25, 1944, and the shipment was moved, in bond, to a warehouse in New York City. Of the 500 bags, 235 were set aside as being stained and discolored, and such a notation was made on the warehouse receipt. On June 5, 1944, a joint survey was held at the warehouse, and reconditioning of the stained paprika was recommended.

13. The paprika was originally packed in clean, double burlap bags. The bags were new. The stains and discolorations were evident and plainly noticeable. Beneath the stains and discolorations the paprika was bleached and caked, and in some instances beneath the caking it was mushy and damp. The damage was external, and was caused by contact with fresh water.

14. The manner in which the paprika came into contact with fresh water was unexplained, and the evidence is insufficient to show that the damage did not occur aboard the "Ciano."

15. The damaged paprika was reconditioned at a cost of $552.29, and it was repacked in new single bags which cost $77.55. These costs were fair and reasonable.

16. Altogether 180 net pounds of paprika were lost by reason of the reconditioning process. This loss was normal.

17. The damaged portion of the paprika, after reconditioning, consisting of 25,670 net pounds, was sold for 29 cents per pound, or $7,444.30. This was the best obtainable price.

18. The 235 damaged bags contained 25,850 net pounds of paprika. Paprika of the same grade had a market value of 45 cents per pound at the time of the delivery. The total market value, if the paprika were in good condition, was $11,632.50.

19. The libellant's loss of profit by reason of the damage was $4,188.20 which, together with the cost of reconditioning and of the new bags, in the amount of $629.84, constitutes the total damage to the libellant, amounting to $4,818.04.

Accordingly, I state the following:

Conclusions of Law

1. This Court has jurisdiction over the subject matter and over the respondents, Sociedad Metalurgica Duro Felguera, and Jacob Mauch and Joseph Klemm, trading as Rice, Unruh & Co.

2. The respondent carrier failed to rebut the prima facie evidence that the paprika was received on board the "Ciano" at Alicante in apparent good order and condition, and failed to show that the damage did not occur aboard the "Ciano", or that the damage was not due to, or contributed to by, its fault or the fault of its agents and servants.

3. The libellant is entitled to recover from the respondent Sociedad Metalurgica Del Felguera in this action and is entitled to a judgment against that corporation in the amount of $4,818.04, plus interest and costs.

4. The respondents, Jacob Mauch and Joseph Klemm, trading as Rice, Unruh & Co., are not liable herein except as garnishees.

An Order may be entered in accordance herewith.